Mr. Higginson, now at this point, you're representing Officer Gardiner. That's correct, Your Honor. I'll be back later to speak for the City of Houston. May it please the Court, I'm Robert Higginson. I'm representing the appellant, Officer Gardiner, for these first five minutes and then later on rebuttal, and I'm also representing Cross Appellee, City of Houston, which I will address a little bit later in the argument. We're here today because the District Court denied Officer Gardiner's motion for summary judgment on qualified immunity grounds following this fatal shooting, and this all turns upon whether the disputed facts are material. Now, the list of undisputed material facts show that it was objectively reasonable for Officer Gardiner to perceive that Mr. Barnes posed an immediate and ongoing physical threat to himself or to others. And Judge Jones had asked for record sites earlier. I'll be happy to provide those. You don't think Judge Atlas' opinion was extraordinarily thorough in going through the facts? Yes, but it was incorrect at the points in which it construed the evidence to characterize Mr. Barnes as unthreatening, that he was just leaning back against the car and not being threatening at all toward Mr. Gardiner at the time. That is not... Wasn't that disputed? Pardon me? Wasn't this disputed, where he was? It certainly was disputed whether or not he thought there was a laser. Oh, about whether he was holding the taser and whether he was leaning against the car or not? Yes. Well, that's disputed, but it's not material to whether he was objectively reasonably perceivable as posing an ongoing threat. This all happened very quickly and in very close proximity, no greater than the distance that I am from you right now. And it was following two physical struggles immediately before that, at this point, that Mr. Barnes was purportedly leaning back against the car. The way Judge Atlas describes it in the record gives the picture of, well, this is all over. All the struggling is over. All the aggression is over. Now let's just lean back and talk about it. That wasn't it at all. In fact, if you look at the witnesses, their various statements from Echols herself, as well as from Irby, Gagnard, Hill, and Hull, yes, the four boys who drove by in the car and saw it, or at least saw some portions of it, they describe this very aggressive, violent encounter, and then when any one of them says anything about leaning back against the car, he then follows it up by saying, and then Barnes pushes himself away from the car, and then Gardner shot him. One of them says he pushes away from the car and looks like he's trying to get back into the car, and then Gardner shot him. That's how a bunch of the shots landed in his back, huh? Yes, Your Honor, besides the fact that whenever someone gets hit with a bullet, it often spins them around and keeps shooting until the threat stops. Is a cop entitled to shoot a drunken person because he thinks he may get on the road? I believe I cited a, well, they're entitled to use whatever is necessary force to stop him if he believes that he presents a Why not shoot the tire out of the car instead? Well, that would be great if that's all it takes. Sure. I mean, that wouldn't necessarily stop a car from moving. But in this case, he ordered him to stop. He ordered him to get on the ground. Barnes engaged with Officer Gardner physically. Judge Atlas's description of it makes it sound like everything was calm, and then Officer Gardner escalated it, to use her words, which is not reflected in the statements of the five witnesses. That isn't how they describe it. And so the characterization that she gave to it is not a reasonable inference from the undisputed facts. I don't disagree with that, but it's a characterization that a jury might draw or might not. That's the problem. Well, that's true, but it would be an unreasonable inference. It would be inferences stacked upon inferences, and this is one reason why it should not go to a jury, because a jury might draw some unreasonable conclusions. Well, what's the material? I mean, you know, you're not really denying that these are material facts, right, whether the altercation had ceased and whether any reasonable officer could have believed that he had a taser in his hand, given the circumstances. What I'm denying is material is if he did or did not have the taser. I'm saying it's material if a reasonable officer could perceive that he had the taser. That's correct. That's the way I put it. And that's exactly right. I just want to make sure that my answer is completely in keeping with the way you asked the question. That's a material question. I see my time is up. Do you want me to continue? No, you've run out of time. Very good. All right. Okay, Mr. Siegel. It's an unusual case where we have two women suing on behalf of the deceased, isn't it? I'm sorry, Your Honor. I didn't catch that. I'm sorry. Right. One is the common-law wife. I understand. One is the baby mama and one is the common-law wife. That was put at issue before. If I represent the Eccles parties, Martin Siegel. More importantly, you represent Mr. Tolan, don't you? Yes, I did represent. I did. I don't forget. I did handle that case, Your Honor. So to begin, I'll start with Officer Gardner's appeal, and then I'll handle our cross-appeal on the municipal liability claims, and then I'll come back to our cross-appeal against the apartments. This is not a cross-appeal. This is two separate appeals. One is interlocutory and one is a final judgment against your client. That's true. There was a certification under Rule 54B that. All right. I know you're calling it cross-appeal, but interlocutory appeal is entirely separate. We're hearing both of them. It doesn't make a difference what we call them. Fair enough, Your Honor. That's right. We're hearing them together today. On the subject of Gardner's appeal, Judge Jones, I think you hit the nail on the head. It was a thorough opinion by Judge Atlas below. Five witnesses saw this confrontation. They were all consistent in testifying that he had nothing in his hands. They were separated by several feet. He was no longer. They had a little struggle, but he was no longer threatening Officer Gardner. Well, I'm not sure. Well, let's go. Now, of course, Officer Gardner does tell a very different story, and so I just think the solution to it is what Judge Jones, you pointed out, which is a jury will resolve it, and a jury may believe Officer Gardner, or they may believe the five witnesses. Shouldn't the extent that the present counsel is actually arguing that the witnesses say that he had been engaged? Would the record bear that out? No, Your Honor. He was standing by a car. Several of the witnesses say he was standing by a car several feet away, and they are not. They'd finished their struggle. They were now part. In fact, there was testimony that his hands were in the air with nothing in them. We think this is fairly open and shut. It's got to go to a jury, and unless there are other questions on it, I would turn to our Municipal Liability Appeal if I could. As the Court knows, that's premised on deliberate indifference based on failure to supervise and to discipline. Judge Atlas was correct that that claim has three elements, so I just want to go through those. The first is whether or not there was inadequate or deficient supervision or discipline. We think there was for three reasons, but the first is really most important, and that's what I want to focus most of my argument on today if I can. That is, he was a person, there are only five or six a year, who had more than four IAD complaints in a year, more than four citizen complaints. Under HPD rules, he was supposed to have gone over to what's called the Personnel Concerns Unit for inclusion in an extensive remedial program called the Personnel Concerns Program. What year were those four complaints? 2006, Your Honor. And that was how long before this incident? This was in 2009, so it was three years before. And how many of those were sustained in 2006? None of them were sustained, and, of course, that's part of our complaint, is that their investigative process almost never sustains complaints, and I will get to that. But regardless of that, the police department itself understands and appreciates the importance of not sustained complaints. So if you have four not sustained complaints, they still want to know about them, and I'd like to, if I could, it's an important part of our case, quote the chief of police on this because this is critical. He said, just the number of complaints itself is a pattern. If an officer is generating complaints, then certainly we need to look at their method of operations. It doesn't matter whether the complaint is sustained or not. You know, sometimes it's impossible to prove one way or the other, so it's important to look at not sustained complaints also. That's in our brief at page 11 with the record site. So he should have gone over to the personnel's concern unit where they're going to put him in this 240-day program of extra monitoring, ride-alongs, extra supervision, psychological counseling, but that never happened. For some reason that's never been explained, the department violated its own policy and did not provide that level of scrutiny or possible recommendation to the personnel concerns committee. So that, in our view, is deficient supervision by definition. Well, that might be negligence, but it sure is a long way from a municipal policy. Well, it's a we don't really know what it is. All we know is it didn't happen. Well, but you only can recover under the law if it amounts to a municipal policy. Well, it can be a custom, Your Honor. It can be a custom. And what happened in this case, you can have a deliberate indifference case based on a single officer who has a pattern of complaints that is never addressed. And we've cited a number of those cases. Is that your only theory, really? Is it the single officer theory with the number of complaints that's supposed to be used sparingly? Is that really where we fit in here? It is where we fit. We do have other evidence of a pattern, which I'd certainly like to address. But it is, I think, it's the core of our case. He had ten complaints over a fairly short period of time when he was an officer, only 2002 to 2007 or 2008 or so when these complaints happened. And if you have a single officer who you're on notice to address, and they clearly were, because their own system says when you have four or more not sustained complaints, now you're potentially a problem officer. That's the phrase used by their witnesses in their depositions. And we need to address you. So that's the bag he falls into. And we think that's deficient supervision by definition. But I do want to get to the other, what you mentioned, Judge Elrod, I think, which is the other evidence of deficient supervision is how they conduct their internal affairs review process. So we had expert testimony from Roger Clark, and we also just looked at how quite extensively, I think, in our brief, how the past complaints against Officer Gardner went. And essentially what they do is they take statements from different witnesses that complained, and then the officer, and if there's no resolution, of course there isn't because they disagree, then they say, well, these are not sustained, and they do nothing further. They also provide the officer with the questions they're going to ask him in advance. They give him the entire investigative file. So we think this is a process that isn't robust.  In the city of Fort Worth where somebody tried to demonstrate a municipal customer policy by just showing a big chart of alleged complaints against members of the police department, and we said that was not admissible because it was too inspecific and too, you know, the complaints don't mean that there was any legitimate basis for the charges. There is a decision that says that. There's also a decision in Peterson. The Peterson decision says, actually, if you have complaints that are not sustained, if you have so many complaints that are not sustained, that really cuts in favor of the plaintiff because it begins to suggest that there isn't a robust investigative process. So there is some – Well, at least if you have the police chief saying we're concerned when they're not sustained, like you have here. Exactly. Well, I don't think that happened in Fort Worth that I recall in that opinion. We do have that here. And that's built into this process. One thing if you just set it in deposition, their entire supervisory process is to flag those and then send them over for much-needed remedial retraining. And he didn't get that. So I think that's deficient, again. But Judge Atlas found that that was not the moving cause of the violation. She did find that, and so maybe I should turn to causation because that's the second element. So we have two theories of causation. The first is if he had been put into that program, a jury could find that he would have been retrained and would have come out at the other end of the 280 days an officer who wouldn't commit these violations. And that's not just our view. The department's quite proud of the Personnel Concerns Program, and it says it thinks it's the best early warning program in the country. It says there's been very little recidivism after someone goes through it, or a few people have flunked out of it, and they don't complete the 280 days, and they're fired. So the alternative was he's likely to be changed at the end of it, or he's going to be fired. A jury could find that this incident wouldn't have happened if he had gone through that program as he was supposed to do. As 70% of the officers who have these four or more complaints in a year, they are recommended for this program. So that's our primary causation theory, but we do have a more general one, which is there's a lot of law. We cite a number of cases in our brief that says if the police department has a sort of culture and a known atmosphere of lax discipline, well, then it can be assumed that officers respond to that, and that that affects their behavior. Now, Judge Atlas said, well, you're just assuming that that would have influenced him or that had some relevance to him. We think a jury could draw that conclusion and that inference after 10 episodes of going through IED investigations where nothing ever happened, where every last one of them was not sustained except for a couple of shootings which were found justified. So it is a fair inference I think the jury could draw, but our primary causation theory has to do with the personnel concerns program. What's your very best case for someone who was able to get to a jury? Beck. I think our best case is the Third Circuit decision in Beck. What's your very best case in this circuit? Well, I don't think we've had – we just haven't had facts like this in this circuit. We've certainly had a couple of, you know, Bryan County. We've had a couple of municipal liability cases. We haven't had one. We've had a whole bunch of them in the city of Houston over a period of years. I think that's true, Your Honor, but you really have to look specifically at the officer. Now, we're not – we have pointed out what we think are deficiencies in the way HPD does things, but we've never had an officer that I'm aware of in these cases who led the entire department in tasings, who had these ten complaints, and who fell into a bucket that they themselves admit qualified him for required consideration in this special remedial program. That's unique. That's a failure of supervision on their own terms, and the reason we think it's – But was it a pattern? You can draw a pattern from a single officer. That's number one. Number two is we did have expert testimony from Roger Clark as to 150 other cases where he looked at the data that was available and found that these investigations were subpar. Now, we're not – that's not key to our case. But again, I go back to that other case where I think it was held to be non-relevant. I could be wrong, but I remember – I just remember we didn't take account of all these complaints, and even Mr. Clark, quote, expert that he is, didn't have access – he didn't go back and review the witnesses and all that, right? He just said the paperwork is deficient. Well, he didn't say the paperwork was deficient, but what he was working with, I believe, were summaries of these investigations. So he could see that they had interviewed witnesses who disagreed with the officers and every time they ruled for the officers. Well, does that mean they're wrong? No. We don't know what it means. All we know that it means – That's my point. You can't establish a pattern when your witness isn't willing to say, I don't know if they're wrong. No, what we can establish a pattern of is deficient investigation. We can't go to every incident and say the police department is right or wrong because we don't have the data. But we can say that what they do is they take cursory statements and then throw their hands up and say it's not sustained because we can't verify it one way or the other. You're right. We can't go within the incident and prove the incident. We can just prove how they do investigations and show why it's deficient. Right. But, I mean, you don't even know that the statements are cursory, do you? Well, we know that – In other words, they may be – No, we don't know the length of the witness statements. The interviews might have taken an hour or more, and they wrote it up because, well, I tried everything I could. I tried to elicit all the information I could, but there's nothing there. That's fair enough, Your Honor. But we don't know the length or extent of those statements. We just know that when they conflict, as they almost always do, they say, well, what can we do? Not sustained. Another one's not sustained. So we just think that isn't sufficiently robust. Other than that, let me go back to the other theory, the theory that this particular officer has so many incidents and so many incidents regardless of whether he's actually responsible, that that itself is a signal. Yes. That's your main argument. That's our main argument. You don't have to look at other officers in your culture. Exactly. I mean, that's sort of your second argument. Your main argument is this officer is the single incident liability officer because he's got so many – he's a single officer. Exactly. With many incidents. It's a pattern in regards to this officer. That's exactly right. And I don't think it's a single incident case. It's a little confusing. That's a totally different thing. Exactly, right. And Judge Jones, in your opinion and Piotrowski, I think you said this. You said if there had been a background of complaints about this officer, then there would be something different. This Court's opinion in Valley says that. It goes all the way through the elements of deliberate indifference in the Valley case. It finds every one of them, and then it gets to the end and says, well, I'm not sure we have a pattern here. Well, you don't have a pattern of excessive force. You had a whole – you had 23 complaints in a period of five or six years. The fact that he discharged the taser doesn't mean that he discharged it inappropriately, and some of those complaints were abusive language or he grabbed my arms. Right. So you really can't say that you just can't attribute those to his shooting this fellow at the same late – on this occasion. What he has a pattern of – first of all, we don't rely at all on the car accident or the dog case. Some of those don't matter. He had 23. Some of them don't matter. We focus in on the 10 citizen complaints of excessive force. So again and again, almost every year, more than that, it was less than 10 years, he's having a citizen complain about the use of excessive force, and it isn't adequately investigated. So we think that you can predict the 11th occurrence after the first 10. That's essentially our case. But none of them – again, I mean, one of them had to do with a woman saying he grabbed my arms too tight. Well, no. I think that woman, if we're talking about the same one, was dragged out of her car and her ribs were broken. Then there were shootings. There were people who were beaten with a flashlight. I mean, this is fairly serious use of force. Now, you could be right that if we probe deep into each one, we might come out for the officer, we might come out for the witnesses. No other lawsuits filed against him. Say again. No lawsuits filed in regard to any of those. The record doesn't disclose any. I'm not aware of them. I think the key thing is the – Well, you could have looked it up. Fair enough. I think the key thing is the department says we care about – we don't just look at the ones that are sustained. We care about not-sustained complaints because we know, as the chief said, just the number of complaints is a pattern. If the officer is generating complaints, then we need to look at their method of operation. Quite right. And they didn't do that. I'm out of time. I'd like, if I could, a few extra minutes to talk about our case against the apartment, which was built into these 15 minutes, if I could. I'll give you one minute because we know what that case is. Fair enough, Your Honor. Thank you. What that boils down to, there are a variety of arguments going back and forth about what the complex could have known or what it could have found out. What the case really boils down to is their defense that we can hire a police officer as long as that officer is in good standing. We don't need to look at anything else about them. I think that in this day and age, a jury could find that that's unreasonable. Okay. I think that's a presuming part. I think that's red herring that they could have subpoenaed the documents. It seems to me that there's still a fundamental flaw with this case of causation. The negligent hiring, how does that cause the death? Because he's acting in the capacity of law enforcement whenever the death occurs. I don't see how negligent hiring had a good causation. I think maybe we're mixing two theories. There was a theory about vicarious liability, and the defense to that is, oh, no, he's not their employee for these. I get that. But I'm saying that how can you say that his negligent hiring is what caused anything here? Because they put him in that position. He's there as their security guard. He wasn't acting in that position. He was acting for the city as a police officer. He only encounters these people as their employee ensuring security on the premises. And I would say in the Fifth Club case, in the Duran case that we rely on, those are exactly like this case. Those are officers who are security guards, and they sue the complex, the employer. And liability is allowed against the employer. It's never held that they're not liable just because he's then stepped into some role as a police officer. That's right. It's a chain. No, not at all, not at all. That doesn't appear in any of those cases. And, by the way, if that is an argument, they've never made it. So I'd also say it was waived. But, you know. You've gotten more than a minute. Thank you. I'm taking my time right here. Mr. Higginson for the city. First of all, I'd like to acknowledge that Judge Reveley's comment that this is not a cross appeal but another appeal is an issue that created quite a bit of confusion with our communications with the clerk's office and the proper designations of the parties and the positioning and so forth, which is part of the reason why we have the little jack-in-the-box up and down five people. That's okay. And who's named what? Numerous, numerous emails. I won't hold it against anybody. We appreciate that. Well, thank you. I'll take credit for that. But don't waste his time. Thank you. Okay. I think that we have a problem here of the lack of causation against the city. The claim that he would have gone to the personnel concerns program or the PCP. First of all, there's no requirement, no constitutional requirement that the city have this in place. The city does have it in place. This, in fact, cuts against their argument and shows that the city is very concerned and doesn't have a custom of not looking into the conduct of their police officers. And since none of these complaints against him were sustained, he would not have been referred to the personnel concerns program anyway. Moreover, the number of complaints are no evidence. I'm confused about that point. Yes. I thought that the IAD point, when they're not sustained, you still get referred automatically. Maybe we're talking about two different things. I thought that 70% of the people were referred automatically, not when you have over four IADs in one year. I believe that's only if they are sustained. I could be mistaken about that, but that's my understanding. Also, there is no evidence in the form of statistical analysis, which would be necessary to show that there were other similar incidents, to show a pattern here for the city of Houston. Their expert testimony from Roger Clark didn't give a statistical comparison with other shootings, and the number of taser discharges is not analogous to the use of deadly force with a firearm. Is it unusual to see a case with ten people in the front row with deadly force? Well, there's not any evidence that says that it is. There is, however, evidence that says that he was an actively engaged officer who took his responsibilities very seriously, and so he was engaged with the public and that he worked in a very high-crime area. And so if he's working in a high-crime area and he's attempting to intervene and engage with the public in something that he sees that doesn't seem like it's going right, then that might be fertile ground for a lot of IAD complaints that would end up being dropped without information, without a follow-through on the part of the complainant, or not sustained. Where is the Woodland Hills apartment located? Wow. I will ask Ms. Burge. I apologize. I'm drawing a blank on that right now. But that wouldn't necessarily correlate to where his beat was. No, I understand that. Okay. If he had been flagged, as plaintiffs are suggesting, it would not have been for retraining but for evaluation. And so there may have been an evaluation here, and we don't even have the evidence of that. So it wouldn't have been for retraining necessarily. It would be to evaluate if he needs to go into the program or not. And so he could have been evaluated or not. We don't have evidence of that. Moreover, there's no evidence that the position that they flag people and then they decide whether or not they merit going into this remediation program. Yes. Yes. Okay. Not over four that would be sustained, but, you know, a number of complaints. Right. And then at the most, this would show negligence on the part of the city. If there's this program and the city could have put him in there, even if the city had a duty to put him in there, which the city did not, then the most it would show is the city violating its duty to refer him there. And the most that is is negligence, which, of course, doesn't qualify for municipal liability. There also is no evidence in the record of how many officers get disciplined and how many do not. So there's no evidence to really show that there is a culture of going easy on IAD complaints, excessive force complaints. Their best case, back from Pittsburgh, says that they presented in that case much more than mere statistics and that in that case the city of Pittsburgh had no formal system for tracking complaints. Here we have a very robust system with many stages involved, and in the record there's quite a bit of evidence showing that there was a lot of an analysis. If you have officers, IAD investigators, considering a complainant and the officer here, they have to make a credibility determination there. They wouldn't necessarily go for the officer every time, and we have officers who have been disciplined, of course. But you wouldn't expect that they would always go against the officer and for the complainant either. So like a jury or any fact finder has to make a credibility determination, this is done at various stages as well. That doesn't show a culture of corruption or going easy on officers. HPD has a very robust and thorough investigation process, and it's nothing like the case back from Pittsburgh. What we have here is an argument from the other side that is sort of like when people say that there's a conspiracy, but then when you point out that there's no evidence of a conspiracy, they say that's all just part of the conspiracy to make sure that all the evidence is hidden. We just had that case. I want to spend another couple of minutes here talking about Officer Gardner. These are the undisputed facts that show that it was objectively reasonable for him to perceive that Mr. Barnes was an ongoing threat to him. This occurred at dark. Barnes was intoxicated at over twice the legal limit, although Officer Gardner couldn't have known how intoxicated he was. He smelled the alcohol on him, and he could perceive the intoxication. When Officer Gardner came on the scene, Barnes had just had this violent encounter inside that Officer Gardner, of course, didn't witness, but that gives us an idea about the state of agitation that Barnes was in. Pardon me? I say, was Miss Echols screaming? How did he perceive her state of mind as Gardner approached her, as Barnes approached her? Well, she was crying and looked frightened, and so I didn't get that she was screaming, but she was crying, looked frightened when Barnes approached her. The undisputed evidence is that Barnes rushed toward her. He appeared angry at the time, and Barnes was pounding on Miss Echols' car, which is what caught Officer Gardner's attention to begin with. So he was vandalizing this car, and Gardner told him to get on the ground. Echols told Barnes that he needed to leave. Barnes wouldn't leave. Barnes ignored Officer Gardner's verbal commands. And I have numerous record sites in here in Gardner's reply brief. They got into a huge fight. That's correct. Officer Gardner removed his taser, pointed the light at him to get his attention. Barnes ignored this, attempted to get into the car. At that point, knowing this guy is drunk and there may be a weapon in that car, Gardner went over and physically removed him from the car. From his own car? No, it was from Echols' car. Echols' car. Echols saw them struggling, did not know, could not see what they were struggling over. When they separated from that struggle, Officer Gardner perceived that his taser had been taken from his holster. Officer Gardner drew his gun and ordered Barnes to the ground. Barnes refused that order. Officer Gardner fired, striking him seven times.  One thing, one of the witnesses in the truck said that, what was the difference in size between these two men? One of the witnesses in the truck said that Barnes was significantly larger than Officer Gardner and that he could have been intimidating to him. He said that he couldn't tell who the aggressor was. And even though he thought that Barnes wasn't acting in an aggressive way, that it could have been intimidating and he could have taken the officer. So this was an indication that Barnes was much larger. I thought Barnes had Officer Gardner down on the ground at one point. He did, and that was the second time. That's correct. And so this is why when they got up from that, that Officer Gardner thought that Barnes had his taser. And my time has just run out. Yes, sir. Thank you. Okay, Ms. Burns, you might tell us where, for my interest, where the woodlands were. Yes, Your Honor. The Woodland Hills Apartments are on the north side of town towards the Humble area. We're on what exit off of 45 or 59? Oh, Your Honor, I don't know. I've been out there. I can tell you it's very close to Humble going out 59, going out that direction towards Atascocita. Okay. May it please the Court, my name is Tracy Burge, and I am here on behalf of JS Property Management and Hayden Properties, which are the owner and the manager. The sole issue for me to discuss is whether or not the district court was correct when they found that Woodland Hills did not negligently hire or retain Officer Gardner to act as a courtesy officer there at the apartment complex. Judge Atlas granted our motion for summary judgment based on a finding on two elements. She found that there was no breach of a duty by Woodland Hills, and she also found that there was no proximate cause. So the Court could sustain or affirm the summary judgment on both of those findings that Judge Atlas made. The two controlling cases on this matter would be the Fifth Club case, which is the Texas Supreme Court case of 2006, and then the Fifth Circuit case of Conn v. the Houston NFL Holdings, and that is from 2008. Per the Fifth Club opinion, and then also confirmed in the Conn case, Officer Gardner's status as an active duty police officer, a certified police officer, made him fit for this type of work, that being a courtesy officer or a security officer. So in terms of whether or not he was fit for the type of work to do this as a police officer, that has been confirmed by Fifth Club and Conn. The real issue here in this particular case is whether there was conflicting evidence that he was unfit for the courtesy officer position. And the argument that the plaintiff makes is that Woodland Hills should have discovered these internal police personnel file materials on Officer Gardner. They say that this would have put them, my client, on notice of several things. Is that really the plaintiff's argument, or is the plaintiff's argument just that he should have done some more due diligence, such as ask him, does he have citizen encounters that are negative? That is their argument as well. It's that they should have asked for the I.A.D. complaints as well as ask him. And if they had asked him, they would have only found the same information that they could have found in the internal affairs files. Not in the internal affairs files probably, but it's really easy to ask the prospective employee all sorts of questions. And absolutely. And if they had asked him that, what they would have found was that he had absolutely no sustained findings of the use of excessive force. Sorry, but they might have asked him, have you had any citizen complaints? We don't know if they would have asked him, but they could have asked him, do you have any citizen complaints against you? And if they asked him that, and if they asked him that, they would have learned that he did have some complaints, none of which had been sustained, which is the important factors because there's no evidence that those complaints have any value whatsoever. They were looked at. They might have said he had bad luck. I don't want to hire somebody who had bad luck and keeps having these encounters. It's not his fault at all. They would make the employer's decision on whether they wanted to hire him or not. But they're relying on the fact that he is a police officer and that he's in good standing and he's an active-duty police officer. So you would expect that there may be some complaints against active-duty police officers who are working in high-crime areas where there is a lot of activity. He was on a tactical unit. My clients are not professionals with regard to security, and to put the burden on them to ask about any complaints and have to make a decision without knowing the facts of those cases, not knowing what the complaints specifically say, and to hold that against him and not allow him to have a separate job apart from the HPD, that's calling for extraordinary care as opposed to ordinary care on the part of my client. Well, there has to be foreseeability, and if they had asked the questions and learned the information that there was, there would be no foreseeability on the part of the... Can you cover proximate cause, please? Yes, ma'am. Proximate cause, of course, has to do with cause in fact and foreseeability. And in this particular case, Judge Atlas found that there was no foreseeability. And again, that goes back to the fact that with regard to his history, there had been no sustained findings of any excessive force. There had been two at-fault accidents that would have nothing to do with foreseeability of harm in this regard. There had been three shootings, but all of the shootings had been determined to be justified. There had been taser uses, but all of those taser uses had been found to be within the department's policy. Excuse me, I think my earring just fell off. Officer Gardner had never been disciplined or reprimanded in any way by HPD other than for the two at-fault accidents. Your red light is on. I realize you had five minutes, but, you know, so what do you have to say in conclusion? In conclusion, Judge Atlas found that there was insufficient evidence to support a finding of negligent hiring, and particularly what she found was that... We can read your opinion. All right. Thank you. Thank you, Your Honor. Okay, Ms. Siegel. You've already talked about what was a hit. Okay, so you're in a rebuttal mode on that. That's right. Did you get your earring? Yes, ma'am. Thank you. Okay. So let me start with the case against the city. Your Honor, Judge Elrod, you're correct. Even if the complaints are not sustained, you get flagged and you get sent over to the Personnel Concerns Unit. What's your record site for that? 1450 is where the city policy appears, and it says each month the PCU will perform a computerized scan of IED records to identify officers who are the target of four or more sustained or not sustained IED complaints, and the reason for that is in the passage I gave you in my initial argument from the Chief. He wants to know whether or not there's an officer who's constantly generating complaints. That itself is a concern. I want to address the argument, well, the most this shows is negligence. That's incorrect. What it shows is if you have a pattern, what it shows is deliberate indifference. We can't get in their minds. We don't know what they thought. There aren't memos about why they didn't do this, but what the case law says quite clearly, in Beck, in a Second Circuit case called Vann, in a Second Circuit case called Fiaco, in a number of district court decisions, all of which are at 44 to 46 of our brief, those cases say clearly that if you have an officer with a lengthy record of problems, even if he's investigated as he was in Beck, I think counsel's incorrect to say that in that case there was no investigative process. There was in Pittsburgh, and they found just as they do in Houston, they found them not sustained, and just as the city has done in this case. They went into court and said, oh, well, these don't matter. They're not sustained. And the Third Circuit said, no, you have a pattern of complaints alone a jury could find is a problem, and that's what we have in this case. That's the essence of deliberate indifference. I'm indifferent to a record of violations. So then basically what you're saying is that any officer who has bad luck and is the target of about 10 unsustained complaints has to be fired. No, Your Honor. We're just saying that based on the- Well, it is because otherwise if something happens again, the city's going to be liable. If the record is long enough, if the incidents are serious, in this case he led the entire HPD in tasings, he had several shootings, eventually it becomes a fact question. If you have one or two, maybe you could say as a matter of law, well, this doesn't matter. Eventually- He had that at one point, and then there were none, no tasings at all, in at least two years before this incident occurred. Again, it's a question of what a jury could find. Do we have a fact question? Could a jury find that when they flunked their own procedure, their own system that says this guy's a problem officer and we have to consider him for this 240-day program, when they didn't do what their own policy requires them to do for a problem officer, is that deliberate indifference? We think it is. But their evidence is going to be, or is, plainly, that they're doing more than the law requires in setting up this early trigger system. There is no constitutional requirement for them to have an early trigger at all. That's right. It's not. So I don't see how you can contend that there's a fact issue, but because they violate a very generous early warning system, that there's a fact issue of deliberate indifference. We're not suing them for not having an early warning system. I know that. We're suing them for the way they handled this one guy, this one officer. As Judge Elrod pointed out, a pattern with that officer can constitute deliberate indifference. So you're right. They have this system, and it usually works. This time it didn't. And he has all these other, you know, the tasings, that we have the expert testimony about how they handle IED complaints. So that, in this case, ought to be enough. It's admitted poor supervision when they have this system. The point that they didn't follow the system goes to the causation. That doesn't go for the pattern. The pattern exists regardless of whether they have a mediation system. Well, that's right. Yes, Your Honor, that's right. I guess all I would add is that it shows us the seriousness. It shows us how they consider four complaints in a year. They say, this guy's now a problem. So you don't have to take my word for it. You don't have to say, oh, well, we don't have to sit here and think, well, it's four good, it's four bad, does that matter? No, their own system says, when we have four in a year, now we're concerned. So that's a sign of deficiency, and it's a sign of, in our view, the whole point of deliberate indifference is, were we on notice? Should we have been on notice that there's another constitutional violation coming? By their own terms, they were, because when they get four, they become concerned. But again, there is no principle of constitutional law that says a violation of any local regulation can lead to a constitutional violation as such. No, that's right. We're relying on this. That's right. And furthermore, we don't want to issue a ruling, because we're not experts in police discipline, that more than X number of complaints automatically implies deliberate indifference, do we? Because, I mean, even if this case went to court on municipal liability, as you can see, there are complaints, and then there are complaints. Right. I mean, even Officer Gardner would have the right in his defense to say, well, you know, that lady claimed that I dragged her out of the car. She was drunk as a skunk, and when she was interviewed, she said she didn't remember what had happened. You're right. We don't want a broad rule that says whenever there are complaints, there must be some sort of constitutional violation. What we want is, is there a way to tell whether the supervision is deficient? And we know it's deficient in this case because they themselves say four complaints in a year means you need this program. And that's a constitutional. So suppose some other department says the level is 10.  Then you'd have an argument about are they right that it's 10, or should it have been two? But we don't have that. We can bypass all that in this case because they acknowledge. These are the guys we have to be concerned about. They're only five a year. I mean, out of hundreds and hundreds of officers, there are only five a year. And then 70% of those get sent over to the chief with a recommendation, put this guy in the 240-day program. He is a unique, fairly unique and serious guy. It's a little different, I think, than some of the other hypotheticals. If I could plead for one more minute on the apartment case. No. I mean, I gave you extra time before, so I appreciate it. All right. Thank you. Okay. We do have your case, though. Well done. Thank you.